BLOCK FINANCIAL CORP., Respondent–Appellant,

v.

AMERICA ONLINE, INC., Appellant– Respondent.

Nos. WD 62286, WD 62317.

Missouri Court of Appeals, Western District.

Nov. 9, 2004.

Lawrence A. Rouse, Kansas City, MO, for appellant-respondent.

Robert L. Ward, Kansas City, MO, for respondent-appellant.

Before NEWTON, P.J., BRECKENRIDGE and SPINDEN, JJ.

PATRICIA BRECKENRIDGE, Judge.

A jury awarded Block Financial Corporation $17 million in damages on its breach of contract claim against America Online, Inc. (AOL). The court entered judgment on the verdict and further ordered AOL to pay Block Financial $4,441,890.41 in prejudgment interest. Both AOL and Block Financial appeal. In its appeal, AOL claims that the trial court erred in denying its motion for a directed verdict or a judgment notwithstanding the verdict because the language of the contract unambiguously terminated the rights Block Financial sought to assert. AOL further claims that, even if the contract language was ambiguous, the trial court erred in admitting irrelevant extrinsic evidence offered by Block Financial. Additionally, AOL argues that the court erred in awarding pre-

judgment interest. In its cross-appeal, Block Financial argues that the trial court erred in calculating the prejudgment interest award from the date it filed its petition instead of from the date AOL breached the contract.

Because the language of the contract is susceptible to different interpretations, the trial court did not err in ruling that the contract is ambiguous, permitting the introduction of extrinsic evidence to construe the contract, and submitting Block Financial's breach of contract claim to the jury. AOL failed to preserve its claim that the trial court admitted irrelevant extrinsic evidence to construe the ambiguous contract, so that claim will not be reviewed. As for the award of prejudgment interest, Block Financial was entitled to prejudgment interest, computed from the date it filed its petition. Therefore, the trial court's judgment is affirmed.

### Factual and Procedural Background

Block Financial is a wholly-owned financial services subsidiary of H & R Block, Inc., and is engaged primarily in the mortgage and credit card businesses. In 1994, Block Financial entered into a credit card program agreement with CompuServe, a wholly-owned computer services subsidiary of H & R Block, to provide CompuServe-branded Visa credit cards to CompuServe customers. Under the terms of the credit card program agreement, Block Financial was given the exclusive right to market CompuServe Visa credit cards to CompuServe customers. Every six months, CompuServe was to provide a list of its customers to Block Financial for this purpose. The credit card program agreement authorized Block Financial to use CompuServe's name and trademarks "in connection with the Credit Card Accounts on the Credit Cards, periodic statements, Cardholder Agreements and in other communi-

cations to Cardholders with respect to the Credit Card Accounts and related services." The agreement provided that Block Financial retained this right during the term of the agreement "and after its termination for as long as Credit Cards are outstanding." The term of agreement was three years, beginning October 1, 1994, and would automatically renew every three years unless Block Financial or CompuServe provided written notice of its intention to terminate the agreement at least one year before the end of the initial or renewal term.

In 1996, H & R Block decided to sell CompuServe. H & R Block sold twenty percent of CompuServe's stock to investors through an initial public offering and then decided to sell the remainder of the company outright. H & R Block retained an investment banker, Salomon Brothers, to help sell CompuServe by gathering information about CompuServe and distributing the information to companies who might have an interest in acquiring CompuServe. AOL emerged as a potential buyer, and AOL and H & R Block began negotiating the terms of the sale. Negotiations eventually broke down, however, and H & R Block sought other buyers.

A few months later, in the summer of 1997, WorldCom expressed interest in buying CompuServe. WorldCom was particularly interested in CompuServe's network services business. WorldCom informed H & R Block that, if it bought CompuServe, WorldCom would keep CompuServe's network services business, but it was separately negotiating with AOL to sell to AOL CompuServe's online services business. H & R Block's sale of CompuServe to WorldCom was to be treated as a separate transaction from WorldCom's sale of CompuServe's online services business to AOL. On September 7, 1997, H & R Block, H & R Block Group, Inc., Com-

puServe, WorldCom, and Walnut Acquisition Company, L.L.C.,[1] executed an Agreement and Plan of Merger (the Merger Agreement) providing for the sale of CompuServe to WorldCom. On that same day, WorldCom, AOL, and ANS Communications, Inc.,[2] executed a Purchase and Sale Agreement providing for the sale of CompuServe's online services business to AOL.

Before the sales were closed, however, Block Financial decided to sell its credit card portfolio. Block Financial's credit card portfolio included the CompuServe Visa card and the WebCard Visa, which was another credit card that Block Financial began marketing in January 1996 to Internet users who bypass online services such as CompuServe. Block Financial hired Salomon Brothers and Smith Barney, Inc., to prepare an offering memorandum to promote the sale of the portfolio to potential buyers.

In the offering memorandum, Block Financial represented that the sale of CompuServe to WorldCom and the subsequent sale of CompuServe's online services business to AOL would not affect the credit card program agreement. Specifically, Block Financial stated that the credit card program agreement, referred to as the "affinity" agreement, was "currently in force through September 30, 2000," and would "remain in place upon completion of the sale of CompuServe." The memorandum detailed the major terms of the affinity agreement between Block Financial and CompuServe. Under the agreement, Block Financial was named the exclusive provider of CompuServe credit card services; had exclusive access to the CompuServe subscriber list; could use a "store" in CompuServe's electronic mall; and could use CompuServe's name, trademark and reputation for purposes of marketing the credit card. CompuServe also agreed to "generally" promote the credit card and provide a one-time credit to subscribers of the credit card for five hours of free online connect time. Block Financial was not required to pay a fee to CompuServe for establishing or maintaining the agreement and could assign the agreement to a third-party purchaser of the accounts.

Several credit card providers and others expressed interest in the portfolio, and Block Financial learned that two companies were going to offer bids to purchase the portfolio. The higher of the two potential bids was from Providian Financial Corporation. Before Providian made its final bid, however, it expressed to Block Financial that it would need written assurances from AOL, in light of the pending sale of CompuServe to WorldCom and subsequent sale of CompuServe's online services business to AOL, that the credit card program agreement between Block Financial and CompuServe would "absolutely transfer" as part of the sale of Block Financial's credit card portfolio to Providian. Block Financial contacted AOL, but was unable to obtain such assurances from AOL. Block Financial then received the final offer letter from Providian. The final offer letter stated that Providian's bid to purchase Block Financial's credit card portfolio was contingent upon, among other things, "assurances to Providian's satisfaction (which may include written assurances from America Online Inc.) that no third party has the right to market credit cards or other consumer loans to the Portfolio customer list or the currently existing or future customer list of CompuServe prior to September, 2000," which was the end of the latest three-year renewal term.

1. Walnut Acquisition Company, L.L.C., is wholly-owned by WorldCom.

2. ANS Communications, Inc., is a wholly-owned subsidiary of AOL.

After receiving Providian's final offer letter, H & R Block's general counsel, Jim Ingraham, contacted George Vradenburg, AOL's general counsel, to obtain the assurances regarding the continued performance of the credit card program agreement. Mr. Vradenburg told Mr. Ingraham that AOL would not be able to provide such assurances because, in AOL's opinion, the credit card program agreement concluded as of the closing of the sale of CompuServe to WorldCom. AOL believed that H & R Block released the credit card program agreement in H & R Block's contract selling CompuServe to WorldCom.

Because AOL would not provide assurances that it would perform CompuServe's obligations under the credit card program agreement, Providian withdrew its offer. The other company that had submitted a bid to purchase Block Financial's credit card portfolio also withdrew its offer, for the same reason.

On January 31, 1998, H & R Block completed the sale of CompuServe to WorldCom, and WorldCom sold CompuServe's online services business to AOL. Also that day, AOL sent a letter to WorldCom indicating that it would allow H & R Block to use the CompuServe trademark in the CompuServe Visa credit card program for thirty days from January 31, 1998. Shortly thereafter, Mr. Vradenburg of AOL contacted Mr. Ingraham of Block Financial and reminded him of their earlier conversation in which Mr. Vradenburg had said that the credit card program agreement terminated on January 31, 1998, the day the sale of CompuServe to WorldCom was finalized. Mr. Vradenburg told Mr. Ingraham he was concerned that Block Financial was still using the name CompuServe on the credit cards. Mr. Ingraham told Mr. Vradenburg that Block Financial was converting its CompuServe-branded credit cards to WebCards, but that it would take several months to accomplish. Mr. Vradenburg informed Mr. Ingraham of the thirty-day extension that AOL had granted and indicated that another extension might be given. Mr. Ingraham told Mr. Vradenburg that he did not care about any extension, that Block Financial was going to do what it needed to do to convert the cards and "it was going to take what time it needed." Mr. Ingraham also told Mr. Vradenburg that Block Financial intended to sue. On March 2, 1998, AOL granted another thirty-day extension. The conversion of the CompuServe Visa credit cards to the Web-Card credit cards occurred and, eventually, Block Financial's credit card portfolio was sold to Providian for less than what Providian had offered before the sale of CompuServe.

As a result, on August 8, 2000, Block Financial filed a petition for damages against AOL. In its petition, Block Financial alleged that, when it first attempted to sell its credit card portfolio, Providian offered to buy it for 107% of the portfolio's value. After AOL refused to provide its assurance that it would continue to perform under the credit card program agreement following the sale of CompuServe's online services business to AOL, Providian withdrew its initial offer and ultimately purchased the portfolio for 82% of the portfolio's balance, which was $125 million less than Providian's initial offer. In Count I of the petition, Block Financial alleged AOL breached the credit card program agreement. In Count II, Block Financial alleged AOL breached its implied duty of good faith and fair dealing. In Count III, Block Financial alleged AOL tortiously interfered with Block Financial's business expectancy. On each count, Block Financial sought damages in excess of $90 million, plus prejudgment interest. In Count III, Block Financial also sought punitive damages.

A jury trial was held in October 2002. At the close of the three-week trial, Block Financial did not submit to the jury its claim in Count II for breach of implied duty of good faith and fair dealing. On Block Financial's claims for tortious interference with a business expectancy and punitive damages, the jury found in favor of AOL. On Block Financial's breach of contract claim, the jury found in favor of Block Financial and assessed actual damages in the amount of $17 million. The court entered judgment in accordance with the jury's verdicts and ordered AOL to pay prejudgment interest on Block Financial's breach of contract claim in the amount of $4,441,890.41, which was calculated from the date Block Financial filed its lawsuit. AOL appeals. Block Financial cross-appeals solely the amount of prejudgment interest awarded.

### Merger Agreement is Ambiguous

In its first point, AOL argues that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict on Block Financial's breach of contract claim. AOL contends that unambiguous language in certain provisions of the Merger Agreement between H & R Block and WorldCom terminated the rights that Block Financial sought to assert under the credit card program agreement. This point requires this court to interpret the Merger Agreement.

■■■ The Merger Agreement provides that it "shall be interpreted, construed and enforced in accordance with the law of the State of Delaware." This court honors choice of law provisions as long as the application of the other state's law " 'is not contrary to a fundamental policy of Missouri.' " *Peoples Bank v. Carter*, 132 S.W.3d 302, 304 (Mo.App.2004) (citation omitted). Choice of law provisions apply only to substantive law, however. *Id.* at

305. " 'Procedural questions are determined by the state law where the action is brought. Thus, insofar as procedural questions are raised, Missouri law applies.' " *Id.* (citation omitted).

■■■ The standard of review is a procedural matter for which this court will apply Missouri law. *Moore ex rel. Moore v. Bi-State Dev. Agency*, 87 S.W.3d 279, 285 (Mo.App.2002). "The question of whether a contract is ambiguous is one of law for the court to decide." *J.R. Waymire Co. v. Antares Corp.*, 975 S.W.2d 243, 248 (Mo.App.1998). Therefore, this court will review the issue de novo, "considering the evidence and reaching its own conclusions." *Id.*

■■■ On the substantive issue of interpreting the contract, Delaware law provides that this court must "examine the entire agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous." *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del.Ch.2003). Where contract terms " 'are clear on their face, ... the court must apply the meaning that would be ascribed to the language by a reasonable third party.' " *Id.* (quoting *True N. Communications Inc. v. Publicis, S.A.*, 711 A.2d 34, 38 (Del.Ch.1997), *aff'd*, 705 A.2d 244 (Del.1997)). A contract is ambiguous if it is "fairly susceptible of different interpretations or may have two or more different meanings." *In re Explorer Pipeline Co.*, 781 A.2d 705, 714 (Del.Ch.2001). If the court determines that the contract is ambiguous, "then 'all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, prior dealings between the parties, and other business customs and usage in the industry.' " *Id.* (citation omitted).

AOL argues that three provisions in the Merger Agreement support its contention that the credit card program agreement between Block Financial and CompuServe was terminated upon the sale of CompuServe to WorldCom. The first provision noted by AOL is found in Article II, "Asset Transfer; Settlement of Intercompany Accounts; Release of Claims," in section 2.3. This section provides:

2.3 *Release of Claims.* Effective as of the Effective Time, H & R Block, for itself and on behalf of each of the H & R Block Entities, releases and forever discharges CompuServe and the CompuServe Entities from any and all claims, demands, proceedings, causes of action, orders, obligations, contracts, agreements, debts, and liabilities whatsoever, that H & R Block or any H & R Block Entity now has, has ever had, or may hereafter have against CompuServe or the CompuServe Entities arising at or prior to the Effective Time or on account of or arising out of any matter, cause, or event occurring at or prior to the Effective Time, including, but not limited to, any rights to indemnification, contribution or reimbursement from CompuServe or any of the CompuServe Entities, and whether or not relating to matters pending on, or asserted after, the Effective Time. Further, H & R Block and each of the H & R Block Entities, as of the Effective Time, irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting, or causing to be commenced, any proceeding of any kind against CompuServe or any of the CompuServe Entities, based upon any matter purported to be released hereby.

The express words of this section state that, as of the effective time of the Merger Agreement, H & R Block, on behalf of all of the H & R Block entities, released

CompuServe from "any and all ... obligations, contracts, agreements, debts, and liabilities whatsoever, that H & R Block or any H & R Block Entity now has, has ever had, or may hereafter have against CompuServe" at or prior to the effective time of the Merger Agreement. The credit card program agreement between Block Financial and CompuServe was a contract or agreement that arose before January 31, 1998, the effective time of the Merger Agreement. Thus, AOL argues that, under this section, the credit card program was released on January 31, 1998.

The second provision AOL cites is found in Article VIII, "Covenants," in section 8.18. This section provides:

8.18 *CompuServe Name.* Each of H & R Block and Block Group acknowledges that the name "CompuServe," whether alone or in combination with one or more other words, and including any abbreviations or derivations of such name, is an asset of CompuServe and will be an asset solely of CompuServe immediately following the Closing. Nothing in this Agreement constitutes a license or transfer of rights in or with respect to the word "CompuServe" or any such abbreviation or derivation to H & R Block, Block Group or any other Person (except WorldCom) after the Closing and neither H & R Block, Block Group nor any such other Person shall use or purport to use, license or otherwise transfer the word "CompuServe" or any such abbreviation or derivation for any business purpose after the Closing. Following the Closing, each of H & R Block and Block Group agrees to take all actions and to execute all documents and certificates as WorldCom may reasonably request to effectuate the intention of this Section 8.18.

The express words of this section state that, after January 31, 1998, the name

"CompuServe" is to be an asset solely of CompuServe, and no H & R Block entity can use the word "CompuServe" for any business purpose after that date. Block Financial's CompuServe Visa credit card used the name "CompuServe" for a business purpose. Thus, AOL argues that, under this section, Block Financial agreed not to use the CompuServe name on the credit card after January 31, 1998.

The third provision AOL relies upon to argue that the Merger Agreement terminated the credit card program agreement is found in Article III, "Representations and Warranties Regarding CompuServe," in subsection (a) of section 3.13. This section provides, in pertinent part:

> 3.13 *Patents, Trademarks, Etc.* (a) Except as disclosed on *Schedule 3.13* hereto, CompuServe and the CompuServe Entities own, free and clear of all Liens or Other Encumbrances, and have the exclusive right to use, sell, license or dispose of or otherwise has rights to use, such patents, copyrights, trademarks, service marks, and applications and registrations therefor, and trade names, trade secrets, customer lists, proprietary technology processes and formulae, source code, object code, know-how, inventions, other confidential and proprietary information, and other intellectual property rights as are necessary to permit CompuServe and the CompuServe Entities to carry on their business as currently conducted (the "CompuServe Rights"), except for failures to own free and clear, license to use or otherwise have sufficient rights to use as would not have a Material Adverse Effect.... Except as set forth on *Schedule 3.13,* neither CompuServe nor any of the CompuServe Entities has licensed or granted to anyone the right to use the name "CompuServe" or any other name associated with or used by CompuServe or the CompuServe Entities.

The express words of this section state that, except as disclosed on Schedule 3.13, CompuServe has exclusive rights to, among other things, the CompuServe trade names, trademarks, and customer list. The credit card program agreement, which gave Block Financial the right to use the CompuServe trade names, trademarks, and customer list, was not listed on Schedule 3.13. Thus, AOL argues that, if Block Financial had desired to preserve its right to use CompuServe trade names, trademarks and customer lists after the sale of WorldCom, the credit card program agreement would have been listed on Schedule 3.13.

In sum, AOL contends that the release of any and all contracts and agreements H & R Block or its entities had against CompuServe contained in section 2.3; the covenant, in section 8.18, promising that no H & R Block entity would use the name "CompuServe" for any business purpose after the sale of CompuServe to WorldCom; and the failure to include the credit card program agreement on the schedule of agreements granting the right to use the CompuServe trade name, trademarks, and customer lists to others pursuant to section 3.13(a) unambiguously indicate that the Merger Agreement extinguished the credit card program agreement on January 31, 1998. AOL argues that any reading of the Merger Agreement that leaves the credit card program intact would render these three "disentanglement" provisions meaningless. Because "a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless," *Sonitrol Holding Co. v. Marceau Investissements,* 607 A.2d 1177, 1183 (Del.1992), AOL asserts that this court must find that the Merger Agreement terminated the credit card program agreement.

When only these three provisions are considered, the Merger Agreement appears to indicate that it is terminating the credit card program agreement. This court must read the entire contract, however, to determine whether the parties' intent is unambiguously evident from the contract's terms. *Comrie*, 837 A.2d at 13. Block Financial cites other provisions in the contract which, it argues, indicate that the parties intended the credit card program agreement to remain intact and enforceable after the sale of CompuServe to WorldCom. In particular, Block Financial cites section 3.8, which is found in Article III, "Representations and Warranties Regarding CompuServe." This section specifically concerns CompuServe's contracts and provides, in pertinent part,

> 3.8 *Contracts.* (a) CompuServe and the CompuServe Entities have made available to WorldCom or, in the case of certain customer contracts, WorldCom's counsel true and complete copies of all outstanding contracts, intellectual property licenses, leases, agreements and arrangements which are Material.[3] Except as otherwise disclosed on *Schedule 3.8(a),* all of such contracts, leases, intellectual property licenses, agreements and arrangements are valid, binding and enforceable in accordance with their terms (assuming the other parties thereto are bound, as to which none of H & R Block, Block Group or CompuServe has any reasonable basis to believe otherwise) and in full force and effect, except where any such invalidity or failure to be binding, enforceable or in full force and effect would not have a Material Adverse Effect.

> . . . .

> (b) Except as set forth on *Schedule 3.8(b)* and except for contracts which may be canceled by CompuServe or any CompuServe Entity party thereto within 30 days without penalty, there are no contracts to which CompuServe or any of the CompuServe Entities is a party or by which CompuServe or any of the CompuServe Entities is bound which: (i) provide for ongoing obligations with respect to any or all of the Online Services Business or the network services business or any other business of CompuServe and the CompuServe Entities after December 31, 2000; (ii) are network services customer, lease or other agreements containing change of control or anti-assignment provisions granting to another party or other parties thereto the right to terminate such agreements or take other action adverse to CompuServe or any of the CompuServe Entities upon or following the transactions contemplated by this Agreement which termination or adverse action would have a Material Adverse Effect; or (iii) purport to limit CompuServe or any of the CompuServe Entities from providing any service in any jurisdiction, whether under the CompuServe name or otherwise, or grant any exclusive geographic, segment or other rights to any third-party, except where the existence of which after the Closing would not have a Material Adverse Effect on CompuServe.

The express words of section 3.8(a) state that CompuServe has made all of the material contracts and agreements available to WorldCom and, except as disclosed on Schedule 3.8(a), all of those contracts and agreements are valid, binding, enforceable, and in full force and effect. Section 3.8(b)

---

**3.** The Merger Agreement defines "material" as "material with respect to the business, operations, properties, assets, liabilities, condition (financial or otherwise) or prospects of such party, and its related Entities, taken as a whole."

provides that, except as disclosed on Schedule 3.8(b), there are no contracts to which CompuServe is a party or is bound that: provide for ongoing obligations of CompuServe after December 31, 2000; are network services customer, lease or other agreements containing change of control or anti-assignment provisions; or purport to limit CompuServe from providing service in any jurisdiction or grant any exclusive geographic, segment or other rights to any third party. Thus, Block Financial argues that, since the credit card program agreement was not listed on Schedule 3.8(a) and was given to WorldCom before the Merger Agreement was signed, it was one of CompuServe's contracts and agreements that remained in full force and effect. Moreover, the credit card program agreement was listed in Schedule 3.8(b) as a contract with a change of control provision to which CompuServe was bound.

Another provision cited by Block Financial is section 4.5(b), which is found in Article IV, "Representations and Warranties Regarding H & R Block." This section provides:

> 4.5 *Assets and Employees Used in CompuServe's Business.*
>
> . . . .
>
> (b) *Schedule 4.5(b)* sets forth all interests, assets and rights, whether tangible or intangible, and whether fixed, contingent or otherwise, which H & R Block or any H & R Block Entity owns, leases, holds, possesses, or controls which are used in or related to the business of CompuServe and the CompuServe Entities, except for any such interests, assets or rights set forth on *Schedule 4.5(a)*. None of the interests, assets or rights set forth on *Schedule 4.5(b)* is Material to CompuServe.

The express words of this section state that all interests, assets, and rights any H & R Block entity has that are used in or

related to CompuServe's business are set forth in Schedule 4.5(b). The credit card program agreement is listed on Schedule 4.5(b). Thus, Block Financial argues that this section evidences the parties' intent that Block Financial keep the credit card program agreement and that CompuServe continue to perform it, whether CompuServe is part of WorldCom or part of AOL.

Block Financial argues that section 3.8(a) and (b) and section 4.5(b), all of which appear to keep the credit card program agreement in effect after the sale of CompuServe to WorldCom, refute AOL's interpretation of section 2.3 as releasing CompuServe from any and all contracts with H & R Block or its entities. Block Financial argues that AOL's interpretation of section 2.3 is further refuted by the existence of other contract terms that either preserve specific contracts or provide for the termination of specific contracts between CompuServe and H & R Block or its entities. Specifically, Block Financial notes that section 8.21 provides that sublease agreements between H & R Block or its entities and CompuServe remain in effect and cannot be terminated for two years after January 31, 1998. Also, section 9.2(i) and (j) provide for the termination of certain tax sharing agreements between H & R Block and CompuServe. Block Financial contends that these provisions discussing the preservation or termination of specific contracts between CompuServe and H & R Block entities would be rendered meaningless or superfluous if section 2.3 is interpreted to release CompuServe from any and all contracts with H & R Block entities.

■ AOL's interpretation of section 2.3 as releasing CompuServe from any and all contracts with H & R Block and its entities would render the provisions preserving or terminating specific contracts mean-

ingless. None of the provisions preserving or terminating these specific contracts refer to section 2.3 or note that they are exceptions to or in furtherance of section 2.3's alleged broad release of any and all contracts and agreements H & R Block and its entities have against CompuServe.

More indicative than section 2.3 of an intent to terminate the credit card program agreement are section 8.18, promising that no H & R Block entity would use the name "CompuServe" for any business purpose after the sale of CompuServe to WorldCom; and the failure to include the credit card program agreement on Schedule 3.13, the schedule of agreements granting the right to use the CompuServe trade name, trademarks, and customer lists to others. Block Financial's right to use the CompuServe name, trademark, and customer lists is the essence of the credit card program agreement. That H & R Block did not include the credit card program agreement as an exception to the provisions prohibiting any H & R Block entity from their use indicates that H & R Block and CompuServe intended that the Merger Agreement terminate the credit card program agreement.

The section of the Merger Agreement that specifically concerns CompuServe's contracts, however, indicates otherwise. Although AOL argues that section 3.8 is merely an inventory of existing contracts and, by its terms, does not convey or retain any rights to Block, the plain language of the section evidences an intent that certain contracts remain in effect. Section 3.8(a) specifically provides that, with the exception of those contracts listed on Schedule 3.8(a), *all* of CompuServe's contracts and agreements "are valid, binding and enforceable in accordance with their terms ... and in full force and effect." The credit card program agreement is not listed on Schedule 3.8(a). Moreover, the credit card program agreement is listed on Schedule 3.8(b) as a contract with a change of control provision to which CompuServe was bound. Also, the credit card program agreement is listed on Schedule 4.5(b) as an asset used in CompuServe's business that is owned by an H & R Block entity. The inclusion of the credit card program agreement in these provisions indicates an intent that the credit card program agreement remain in full force and effect following the closing of the Merger Agreement.

A reading of the Merger Agreement as a whole indicates that it is "fairly susceptible of different interpretations or may have two or more different meanings" on the issue of the survival of the credit card program agreement. *See Explorer Pipeline,* 781 A.2d at 714. Therefore, this court finds that the trial court did not err in determining that the Merger Agreement was ambiguous and permitting the introduction of extrinsic evidence to interpret the contract. *See id.* The trial court did not err in submitting Block Financial's breach of contract claim to the jury. AOL's first point is denied.

### AOL Failed to Preserve Point Regarding Admissibility of Evidence

■ In its second point, AOL argues that, if this court affirms the trial court's finding that the Merger Agreement is ambiguous, which we have, this court should find that the trial court erred in denying AOL's motions for a directed verdict, judgment notwithstanding the verdict, and a new trial as to liability because the court erroneously admitted irrelevant extrinsic evidence offered by Block Financial. Block Financial urges this court not to address the merits of this point because AOL failed to properly preserve the issue for review. This court agrees.

Although AOL contends that the court erroneously admitted irrelevant extrinsic evidence, AOL does not identify the evidence. AOL merely argues that the evidence offered by Block Financial "was not proper parol evidence because it did not consist of contemporaneous statements. Indeed, it consisted entirely of the post hoc views of Block's lawyers as to the meaning of the Merger Agreement, formed *after* litigation ensued." AOL does not point to any specific testimony or other evidence it alleges was objectionable, nor does it cite to the transcript or legal file where the evidence was admitted. The record consists of over 2200 pages of transcript and over 1700 pages in the legal file. This court has "no duty to search the transcript or record to discover the facts which substantiate a point on appeal." *Wilson v. Carnahan*, 25 S.W.3d 664, 667 (Mo.App.2000). Rule 84.04(i) requires that "[a]ll statements of fact and argument shall have specific page references to the legal file or the transcript." " 'Where Appellant's argument lacks references to the transcript pages containing the [circuit] court's ruling, the point is not preserved for appellate review.' " *Collins v. Hertenstein*, 90 S.W.3d 87, 98 (Mo.App.2002) (citation omitted).

After Block Financial pointed out this deficiency in its respondent's brief, AOL attempted to cure it by setting out, in its reply brief, the specific testimony it contends constituted irrelevant extrinsic evidence, with references to the record on appeal. This was too late. *See Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 389 (Mo.App.2000) (stating that the omission of the legal and evidentiary basis for an allegation of error "is not cured by the discussion in the reply brief"). *See also City of Sunset Hills v. Southwestern Bell Mobile Sys., Inc.*, 14 S.W.3d 54, 60 (Mo. App.1999). "Issues submitted in an appellant's brief on original submission are not to be enlarged by presentations in a reply brief as a respondent is entitled to an opportunity to answer an issue presented by an appellant." *State ex rel. Houser v. St. Louis Union Trust Co.*, 248 S.W.2d 592, 594 (Mo.1952).

Given the volume of the record in this case, Block Financial could not have been expected to respond, in its respondent's brief, to AOL's vague assertion that evidence consisting of the "post hoc views of Block's lawyers" was erroneously admitted. After AOL specified, in its reply brief, what this allegedly objectionable evidence was, Block Financial had no opportunity to respond. AOL's second point is denied.

### Block Financial Entitled to Prejudgment Interest From Date Petition Filed

■ AOL's final point and Block Financial's sole point concern the award of prejudgment interest. AOL argues that the trial court erred in awarding Block Financial prejudgment interest. Under Delaware law, "prejudgment interest is awarded as a matter of right." *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del.1992). It is not a matter of judicial discretion. *Moskowitz v. Mayor & Council of Wilmington*, 391 A.2d 209, 210 (Del. 1978). Indeed, "Delaware has permitted pre-judgment interest in many situations where the amount of recovery was not 'liquidated' and where an established market does not appear to have existed from which the amount of recovery could be readily ascertained." *Rollins Envtl. Servs., Inc. v. WSMW Indus., Inc.*, 426 A.2d 1363, 1366 (Del.Super.Ct.1980). "The standard which appears to be common to the Delaware cases is that interest has been allowed where the type of damages permitted testimony from which the amount of the recovery was calculable,

that is, testimony of a pecuniary nature." *Id.See also Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg.,* No. Civ.A. 98C–02–217WCC, 2004 WL 42611, at *6 (Del.Super.Ct. Jan.8, 2004). Such a test "precludes allowance of interest on damages for bodily harm, emotional distress or injury to reputation," and is consistent with Delaware cases that "have denied pre-judgment interest in claims involving assault and battery, libel, slander, false imprisonment and seduction." *Rollins,* 426 A.2d at 1366.

█ In this case, both parties presented expert testimony as to the amount of damages Block Financial suffered because of AOL's breach. Block Financial's expert calculated the damages at $90.5 million, while AOL's expert calculated the damages at approximately $3.4 million. Although these amounts were vastly different from each other and from the amount the jury ultimately awarded, which was $17 million, that did not preclude Block Financial from recovering prejudgment interest. All that was required was that the type of damages permitted testimony of a pecuniary nature. *See id.* at 1366–67. The damages on Block Financial's breach of contract claim did so. Block Financial was entitled to prejudgment interest. AOL's third point is denied.

█ In its sole point on appeal, Block Financial argues that the court erred in calculating the prejudgment interest award from the date it filed its lawsuit, August 4, 2000, rather than from the date AOL breached the credit card program agreement, which was January 31, 1998. In Delaware, prejudgment "interest is to be computed from the date payment is due." *Citadel,* 603 A.2d at 826. "In breach of contract cases, interest generally begins to accrue from the date the breach occurred." *Ripsom v. Beaver Blacktop, Inc.,* 1988 WL 32071, at *21 (Del.Super.Ct.

Apr.6, 1988). This rule is not absolute, however. The "import of the case law" concerning the accrual of prejudgment interest in breach of contract cases "suggests ... that the date of the breach is appropriate only when the breach coincides with, or itself is, the failure to tender payment to the plaintiff when required to do so pursuant to the terms of the contract." *Id.*

█ The breach in this case was not the failure to tender payment due under the credit card program agreement—it was the failure to perform the credit card program agreement. The damages were not based on any amount "due" under the contract, but were instead based on the consequences of AOL's failure to perform. Thus, no payment was "due" Block Financial until Block Financial made its demand for damages. Block Financial argues that it made such a demand when, both before and immediately after the January 31, 1998, breach, it told AOL it would sue for damages from the breach. Although Block Financial may have put AOL on notice of AOL's potential liability at that time, there is no indication that Block Financial actually demanded payment at that time. Block Financial did not demand payment and, consequently, no payment was due until it filed its petition on August 4, 2000. Therefore, the trial court properly calculated prejudgment interest from this date. Block Financial's point is denied.

The trial court's judgment is affirmed.

All concur.