STATE of Missouri, Respondent,

v.

Billy Gene HADDOCK, Appellant.

No. WD 57237.

Missouri Court of Appeals, Western District.

May 2, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 27, 2000.

Application for Transfer Denied Aug. 29, 2000.

Vanessa Caleb, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane D. Crouse, Jefferson City, for respondent.

Before Presiding Judge LAURA DENVIR STITH, Judge ROBERT G. ULRICH and Judge JAMES M. SMART, Jr.

LAURA DENVIR STITH, Presiding Judge.

Defendant–Appellant Billy Gene Haddock was charged with second-degree murder in the death of his wife, Melinda. Mr. Haddock waived his right to a jury trial and was convicted by the trial court of voluntary manslaughter in violation of Section 565.023 RSMo 1994. The trial court sentenced Mr. Haddock to fifteen years imprisonment. On appeal, Defendant claims the trial court erred when it admitted certain evidence because the evidence was irrelevant and its probative value was outweighed by its prejudicial impact in that the evidence indicated past crimes committed by Defendant with which he had not been charged. Because we find Defendant suffered no prejudice from admission of the evidence he challenges, we affirm his conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 27, 1997, Defendant and his wife, Melinda, were at home with their two and one-half year old daughter, Sarah. During the night, Defendant recalled sharing a bottle of vodka that he had brought home that evening as he played with Sarah and Melinda read a book. Later that evening, however, Defendant and Melinda began to argue about the couple's financial situation during the holiday season. According to Defendant's testimony, the next thing he recalls is opening his eyes and finding himself above his wife, straddling her on the floor. He recalls that when he saw her he slapped her in the face.

Defendant and Melinda continued arguing and, at about 11:30 p.m., Melinda stated that she was leaving to get counseling. Defendant followed her. He claimed that she tripped when she was going out their front door, and that is why he grabbed her shirt and pulled her back into the house. He admitted that she screamed when he pulled her back into the house, but denied that it was a scream for help. However, Jack W. Spence, who lived across the street and was on his porch at the time, testified that he heard "a lady screaming profusely for help." He saw that she emerged from the front door of her house and was pulled back in, but he did not see by whom, and that as she tried to stand up he heard her say, "God help me." Mr. Spence headed towards Defendant and Melinda's house to help, but when he reached the door it was slammed shut and locked. At that point, he could still hear Melinda screaming, but the screaming stopped within seconds after the door was shut.

Because Defendant saw someone outside, he turned off the lights in the room and again straddled his wife on the floor.

At that point, Defendant claims, the situation began to calm down, and Melinda told him that she thought she was bleeding internally. At that point, knowing that she was four months pregnant, he moved so as to lay beside her instead of on top of her.

While on the floor, Defendant testified that Melinda began to repeatedly say that she was in love with him, but did not love him, and that the baby she was carrying was not his, but was the baby of the man with whom she had been having an affair. He also stated that she slapped him. Startled by the slap and in order to stop her from making these statements, but, he claimed, not intending to kill her, Defendant got on top of his wife again and began to choke her until she stopped talking and no longer resisted. When she stopped resisting, Defendant got off of her.

Defendant left the house without calling an ambulance and went with his daughter to his mother's house where he told his mother and brother that he had killed Melinda. Defendant's brother called the police and Defendant returned to his house to wait for the police to arrive. When officers from the Independence Police Department arrived, Defendant was placed under arrest.

Defendant was charged with one count of murder in the second degree under Section 565.021 RSMo 1994. Defendant waived his right to a jury trial, and the case was tried to the court on November 9, 1998. At the close of evidence and argument, Defendant argued that the evidence supported only a voluntary manslaughter conviction, while the State argued that the evidence supported a second-degree murder conviction. The trial court found Defendant guilty of voluntary manslaughter and sentenced him to fifteen years imprisonment. Defendant appeals, arguing that he is entitled to a new trial because of error in the admission of hearsay testimony as to prior bad acts toward the victim.

## II. LEGAL ANALYSIS

### A. Admission of Testimony that Defendant Previously Hurt the Victim.

■ Kimberly Carlin was an attorney representing the victim, Melinda, in divorce proceedings pending at the time of the victim's death. Defendant's first point alleges that the trial court erred by allowing into evidence Ms. Carlin's hearsay testimony that Melinda had told Ms. Carlin that Defendant had previously hurt her.

More specifically, the record shows that in his cross-examination of Ms. Carlin, defense counsel asked whether the victim had asked Ms. Carlin to obtain an *ex parte* order of protection against Defendant in December 1997, thinking that she would respond negatively since Ms. Carlin's notes did not reflect such a request by the victim. Ms. Carlin testified, however, that the victim *had* asked her to obtain an *ex parte* order of protection, and said that she just must not have recorded that in her notes. On re-direct examination, the prosecutor tried to follow-up by questioning Ms. Carlin about whether she had suggested that the victim get an *ex parte* order of protection against Defendant during her conversation with the victim on December 19, 1997. Defendant objected to this line of questioning, but the prosecutor argued that it was admissible because it went to the victim's state of mind by showing that she feared Defendant, and the Defendant had opened this up when his counsel questioned Ms. Carlin on the topic of *ex parte* orders.

The court sustained most of Defendant's objections to Ms. Carlin's testimony on this issue, either on the basis that the questions asked for hearsay or that the questions were leading. The court did find that defense counsel's questions about the *ex parte* order had opened up that issue, however, and therefore permitted the prosecutor to elicit from Ms. Carlin that she had suggested that the victim get an *ex parte* order of protection. Ms. Carlin also said she had asked the victim

whether she was afraid for her life and her safety, but Ms. Carlin never gave the victim's answer because, after an objection, counsel rephrased the question and asked Ms. Carlin whether she had asked the victim whether her husband had hurt her. Ms. Carlin said she had asked this, and the victim said yes.

■ The State argues that these statements were not offered for their truth but to show the victim's state of mind, her fear of Defendant, and that, in any event, they were cumulative of other evidence. Statements that narrate past events will only fall within the state-of-mind exception if they are "contemporaneous statement[s] of fear, emotion, or any other mental condition." *State v. Bell*, 950 S.W.2d 482, 484 (Mo. banc 1997). *Accord, State v. Martinelli*, 972 S.W.2d 424, 436 (Mo.App. E.D. 1998). This Court held in *State v. Nastasio*, 957 S.W.2d 454 (Mo.App. W.D.1997):

[S]tatements of a victim's fear of the defendant can be admissible under the state of mind exception to the hearsay rule. We also note, however, that in *State v. Bell*, 950 S.W.2d 482 (Mo. banc 1997), the Missouri Supreme Court reaffirmed that the state of mind exception only permits admission of the statements "in limited situations when they are relevant and the relevancy outweighs their prejudicial effect." *Id.* at 483 (quoting *State v. Boliek*, 706 S.W.2d 847, 850 (Mo. banc), *cert. denied*, 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986)). *See also State v. Shurn*, 866 S.W.2d 447, 458 (Mo. banc 1993), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). The Court also cautioned that because of the danger that the jury might be inclined to consider statements about a victim's fear of the defendant for purposes other than the limited state of mind exception under which they are admissible, the use of that exception "is generally limited to cases where hearsay declarations of mental condition are especially relevant—particularly where the defendant

has put the decedent's mental state at issue by claiming accident, self-defense or suicide." *Id.* at 483.

*Id.* at 458.

Here, Defendant did put the decedent's state of mind at issue because he admitted that he had killed his wife, but argued at trial that it was not his intent to do so. Rather, he claimed her death was the result of an accident and ultimately requested that the court convict him of voluntary manslaughter instead of murder in the second degree. *See State v. Post*, 901 S.W.2d 231, 236 (Mo.App. E.D.1995) (holding that evidence of a victim's state of mind is relevant where the only dispute is whether the defendant acted intentionally or accidentally, not whether the defendant caused the death).

No doubt for this reason, on appeal Defendant now admits that the trial court "properly allowed Ms. Carlin's testimony that Melinda was afraid of [Defendant]." However, he argues, Melinda's final response to Ms. Carlin, indicating that the reason she was afraid of her husband was because he had hurt her, does not fit within the state-of-mind exception and so requires reversal.

■ We need not resolve this issue. Assuming that Ms. Carlin's answer that the victim said the Defendant had hurt her went beyond the state-of-mind exception to the hearsay rule, no reversible error could have resulted from its admission. Although the State did not seek to justify admission of this evidence on this basis, evidence of "[p]revious assaults by a defendant upon the same victim involved in the offense for which the defendant is on trial are admissible as logically and legally relevant to establish a legitimate tendency of defendant's guilt of the charged offense." *Martinelli*, 972 S.W.2d at 436. Second, even were no hearsay exception applicable, in order for an error in admission of hearsay to require reversal, Defendant must show that he suffered undue prejudice as a result of the error. *State v. Hornbuckle*,

769 S.W.2d 89, 96 (Mo. banc 1989); *State v. Evans*, 992 S.W.2d 275, 293 (Mo.App. S.D.1999); *Martinelli*, 972 S.W.2d at 436 (no error occurred in admitting evidence of what victim said defendant had done to her where defendant admitted incident occurred and just denied how and why it occurred). Such prejudice does not exist when the objectionable evidence is merely cumulative of other evidence that was admitted without objection and that sufficiently establishes "essentially the same facts." *Martinelli*, 972 S.W.2d at 436. *See also, Hornbuckle*, 769 S.W.2d at 96; *State v. Draman*, 797 S.W.2d 575, 577 (Mo.App. S.D.1990) ("It is well settled that if evidence is improperly admitted, but other evidence before the court establishes the same fact or facts, there is no prejudice to defendant and no reversible error.").

Here, there was substantial other evidence from a number of sources, including from Defendant himself, showing that Defendant had previously injured his wife. In the two years prior to Melinda's death, the couple began to have serious financial and personal marital problems. On the night of Sarah's first birthday in May of 1996, Defendant learned that Melinda had been having an affair with Martin Burton, their neighbor across the street, and that she had been taking methamphetamines supplied by Mr. Burton. That same night, Melinda promised she would end the affair and stop taking the methamphetamines. Until March 1997, Defendant believed that the affair between his wife and Mr. Burton had ended. But, Defendant testified, in April 1997, anonymous calls were being made to the house. When he asked Melinda about the calls, she stated that she had been seeing Mr. Burton again, but that she would again terminate the relationship.[1]

Defendant's mother testified that Melinda called the police in March 1997, claiming Defendant broke her thumb. Further, at trial, Defendant acknowledged that during an argument he grabbed their daughter, proceeded to leave the house with her, and in the course of doing so, pushed his wife out of the way. Although Defendant later denied ever pushing his wife before December 27, 1997, he then recanted that denial, saying he "may have pushed her on the couch, never pushed her over a couch." Evidence was also introduced, without objection, showing that Melinda had previously claimed that on one occasion when Defendant was trying to leave in their car with Sarah, he continued to pull away even though Melinda's arm was caught in the window. Defendant claimed it was Melinda who was abusive on that occasion.

Further evidence was introduced, without objection, showing that on October 22, 1996, and in March 1977, Melinda had called the police, alleging she was a victim of domestic violence. On April 16, 1997, Melinda filed for an *ex parte* order of protection against Defendant for the incident that occurred in March 1997. While the request for the order of protection was voluntarily dismissed on April 23, 1997, in her request for the order of protection, Melinda claimed to have been severely bruised on her wrist when Defendant tried to take their daughter. Dr. Sam Gulino, a forensic pathologist with the Office of Medical Examiner for Jackson and Platt Counties, noticed similar bruising in one photo which showed oval bruises on the victim's arm that appeared to him to have resulted from grabbing, and Defendant admitted at trial that in the course of arguments with his wife he would purposefully try to anger her by taking their daughter.

Defendant also testified that he learned of the April 16, 1977 application for an

---

1. From April 1997 until December 27, 1997, the couple had more encounters with Mr. Burton. According to Defendant's testimony, Mr. Burton had been following Melinda to work, once threw dust on her car while she was in a grocery store, and one day came up to their living room window and exposed himself. Defendant admitted he was angry, but said that none of these situations ever caused him to be violent with either his wife or Mr. Burton.

order of protection when he went to the police to make his own complaint as to the incident. He stated that he and his wife were having an argument and when he tried to leave with their daughter, Melinda jumped on his back and severely scratched his neck.

Finally, Michael Johann, a Detective with the City of Independence Police Department, testified that when Defendant was questioned by police after having been arrested for the death of his wife, Defendant first stated that he had slapped his wife on approximately five to seven prior occasions. In a videotaped statement made by police and viewed by the court, Defendant admitted to slapping his wife only three to four times. At trial, Defendant claimed to know of only one time that he slapped his wife before December 27, 1997.

The above evidence amounted to substantial evidence of prior fights between the victim and Defendant and prior violence or claims of violence against the victim by Defendant. In light of this evidence, the judge, as fact finder, could not have been affected by Ms. Carlin's statement that the victim had told her that Defendant had hurt her and that was why she wanted an order of protection. Point denied.

*B. Admission Of Photos Showing "Healing" Bruises Was Not Unduly Prejudicial.*

■ At trial, the State introduced a number of photographs taken during the autopsy conducted by Dr. Gulino which depicted various bruises that existed on Melinda's body. As described by Dr. Gulino, some of these bruises were "healing" and some were "fresh." [2] The bruises that were "healing" had no connection to the events that occurred on December 27, 1997, and the State offered no foundation that these "healing" bruises were the re-

sult of injuries inflicted upon Melinda by Defendant. In his second point, Defendant claims the trial court erred by admitting exhibits 3A through 11 because they depicted "healing" bruises.

■ In Missouri, photographs of the victim are generally admissible where they are relevant to a material issue or help the fact finder to better understand a witness' testimony. *State v. Gaston,* 897 S.W.2d 136, 139 (Mo.App. W.D.1995) (explanation of medical examiner's testimony); *see also State v. Simmons,* 955 S.W.2d 729, 738 (Mo. banc 1997) ("Explanation of a pathologist's testimony is an acceptable reason to introduce autopsy photographs."). Courts are granted broad discretion in admitting such photographs, and defendant cannot object to their admission on the ground that they were gruesome where it is defendant's conduct that caused them to be gruesome. *Gaston,* 897 S.W.2d at 139, *citing, State v. Feltrop,* 803 S.W.2d 1, 10–11 (Mo. banc 1991). All of the photographs objected to contained relevant information showing how the victim looked at the time of her death. Thus, we find no error in their admission.

■ It appears to us that what Defendant really is objecting to is the doctor's testimony that some of the bruises were not fresh bruises but were healing bruises, since this implied that Melinda had been injured in the past, and Defendant is concerned the fact finder may have concluded that Defendant caused those healing bruises. Assuming for present purposes that the testimony that some of the bruises were "healing bruises" should not have been permitted, we find no prejudicial error could have resulted from its admission. First, as discussed in detail above, there was other substantial evidence that Defendant had previously been violent toward the victim. Second, we note that Dr. Gulino's testimony describing other healing bruises in other photographs, labeled as

---

**2.** According to Dr. Gulino, "fresh" bruises are caused by injuries suffered at or around the time of death, and could be as far as 12 to 24

hours prior to death. Those injuries occurring more than 24 hours prior to death result in "healing" bruises.

Exhibits 24 and 25, was admitted without objection, and described the photographs as showing:

several small abrasions in the region of the right elbow, and also a fresh bruise with a central abrasion on the right forearm. *In between them are several healing, faded bruises, which are yellow to brown in color, which are small and oval and in a line. These type of bruises are suggestive of fingertip bruises caused by a hand grabbing around an arm, and giving multiple bruises all in a line. . . .*

State's Exhibit 25 shows a *healing bruise* on the left elbow, as well as a fresh scrape on the left forearm.

(emphasis added). Thus, even had the admission of Exhibits 3A through 11, and the testimony about them, been erroneous, because other evidence was admitted without objection and it sufficiently established the same facts, no substantial prejudice could have occurred. *Hornbuckle,* 769 S.W.2d at 96; *Martinelli,* 972 S.W.2d at 436; *Draman,* 797 S.W.2d at 577.

Finally, "[a]ny vitality to [Defendant's] point is further diluted by the fact that this was a jury waived case and an appellate court will presume the trial judge, as trier of fact, was not prejudiced and this evidence was not relied on in reaching a judgment." *State v. Rank,* 849 S.W.2d 230, 233 (Mo.App. W.D.1993), *see also, Draman,* 797 S.W.2d at 577. That presumption applies here.

For these reasons, we find no prejudicial error occurred and affirm the conviction.

Judge ROBERT G. ULRICH and Judge JAMES M. SMART, Jr. concur.