STATE of Missouri, Plaintiff–
Respondent,

v.

Ronald Lee HARRISON, Defendant–
Appellant.

No. 26980.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 16, 2006.

Motion for Rehearing or Transfer
Denied Nov. 6, 2006.

Application for Transfer Denied
Feb. 27, 2007.

Amy M. Bartholow, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Lisa M. Kennedy, Assistant Attorney General, Jefferson City, for Respondent.

PHILLIP R. GARRISON, Judge.

Following a jury trial, Ronald Lee Harrison ("Defendant") was convicted of the class A felony of second degree murder, a violation of 565.021,[1] the class A felony of first degree robbery, a violation of 569.020, and armed criminal action, a violation of 571.015. He was sentenced to life imprisonment, a concurrent term of thirty years imprisonment, and a consecutive term of twenty years imprisonment, respectively. Defendant now appeals, alleging seven instances of trial court error. We affirm.

FACTS

This case stems from the murder and robbery of Defendant's grandmother, Reba Magouirk ("Victim"). Viewed in the light most favorable to the verdict, the evidence reveals the following.

On January 1, 2003, Defendant, who owed a drug debt to Keithy Frederick ("Frederick"), was at his sister Evelyn Blagg's ("Evelyn")[2] house. He was expecting Frederick to stop by and he told his sister, Donna Tackett ("Donna"), and her husband, Frankie Tackett ("Frankie"), to tell Frederick he was going for a walk. Frederick stopped by and requested that Donna and Frankie tell Defendant that he "wasn't one to be messed with." Frankie did not believe that Frederick was threatening Defendant but believed he just wanted his money. Defendant did not seem worried when he received the message.

On the morning of January 3, 2003, Defendant, who was driving a black Cadillac, went to work to pick up his paycheck in the amount of $255.81. Defendant then went to a grocery store in Campbell, where he cashed his check and purchased a half pint of Jim Beam whiskey. Around 10:30 a.m. Defendant stopped at his cousin's house where he borrowed a t-shirt, drank whiskey, and visited for about forty-five minutes.

Defendant went to Victim's house around 11:30 a.m. Victim lived with her son, Jerry Magouirk ("Jerry"), and another son, Rick Magouirk ("Rick"), would also stay with her on occasion. Victim and Jerry were at the duplex when Defendant arrived. Karen Stevens ("Stevens"), Victim's home health care worker, arrived around 1:10 p.m. Both Stevens and Jerry noticed that Defendant had been drinking. Jerry left around 1:30 p.m., but Defendant stayed and went to sleep on Victim's couch.

Stevens left to run errands, but she later returned to bring Victim some food. Around 2:30 p.m., Stevens left to care for a man who lived across the street. As she was leaving, the mail carrier delivered Victim's $400 social security check.

Around 5:30 p.m., Victim's grandson, Joshua McMillen ("Joshua"), drove by Victim's house with his fiancée and saw Defendant standing in the front door wearing a dark shirt with a white shirt underneath. Joshua drove around the block and saw Defendant standing in the same position as he was driving by a second time.

Around 6:30 p.m., Heather Lyons, who lived in the other half of the duplex where

---

1. All references to statutes are to RSMo (2000) and all references to rules are to Missouri Rules of Criminal Procedure (2004), unless otherwise indicated.

2. We refer to those parties with surnames in common by their first name in order to avoid confusion.

Victim lived, heard three loud "bangs" coming from next-door. Also around that time, Rick was at Carolyn Mason's ("Mason") trailer when he saw Defendant drive by. Mason's trailer was catty-corner to the back of Victim's duplex. Defendant turned around and spoke with Rick outside the trailer for a couple of minutes, during which Rick thought Defendant seemed "awful nervous."

Later, around 7:00 to 7:30 p.m., Defendant arrived at David Moore's ("Moore") house with a half pint of whiskey. Defendant told Moore that he knew Moore suspected that he had been involved in stealing $300, but he pulled out some folded cash, and told Moore that he did not have to steal money, because he worked on a riverboat, and had $1,000 at the moment. Defendant left Moore's house around 8:00 p.m.

Rick left Mason's trailer shortly after 8:00 p.m. and returned to Victim's house. When Rick walked into the duplex, he saw Victim sitting in her chair. Rick thought Victim was sleeping, but she did not respond when he tried to wake her. He then noticed that there was blood on her forehead and her left hand was jerking, so he called the police. Rick noticed that Victim's purse was missing.

Officer Justin Hankins ("Officer Hankins") and Officer Marvin Riley ("Officer Riley"), with the Campbell Police Department ("Police Department"), received a dispatch around 8:45 p.m., and arrived at Victim's duplex a few minutes later. Victim was unconscious, but breathing when the officers arrived. The officers saw that Victim had wounds to her head, and noticed blood in front of her, behind her, and on the chair she was sitting in.

Evelyn and Amanda Nelson ("Amanda"), Victim's granddaughters and Defendant's sisters, arrived at the duplex after hearing that Victim was hurt. They were accompanied by Ronnie Nelson ("Ronnie") and Barry Blankenship ("Barry"). Amanda held a towel to Victim's head and tried to wake her. Shortly thereafter, an ambulance arrived, and Victim was taken to Kennett hospital to receive treatment for her injuries.

Victim was pronounced dead at 10:05 p.m. that night. An examination revealed that she had been struck over the head a minimum of seven to eight times with a long, narrow, blunt instrument. The trauma to Victim's head caused multiple skull fractures and brain injury. The forensic examiner estimated that Victim's head injuries were received anywhere between 5:00 and 7:00 p.m.

While at the hospital, Amanda, noticing that she had Victim's blood on her hair, hands and clothes, went into the bathroom to clean up. The evidence was that Amanda hugged several relatives both before and after she cleaned up in the bathroom. While outside, Amanda saw Defendant arrive wearing stained jeans and a dark buttoned up shirt over a white t-shirt. She told Defendant that Victim had died, and Defendant embraced her in a bear hug. Both Amanda and Defendant were crying.

Members of the family were asked to meet with officers at the Police Department that night. Officers wanted to talk to anyone who had seen or talked to Victim that day. Deputy Terry Key ("Deputy Key") interviewed Defendant, but did not consider him a suspect at that time. Defendant told Deputy Key that he had taken a nap at Victim's house from 11:30 a.m. to 3:00 p.m. that day. After he woke up, Defendant said that he watched television with Victim until about 6:30 p.m. when he got Victim's mail and put it on the coffee table before leaving for Moore's house. Defendant said he was at Moore's house from 7:00 to 8:00 p.m.

Around 1:50 a.m. on January 4, 2003, Defendant was interviewed by Sergeant William Cooper ("Sergeant Cooper") and Sergeant Jeffrey Heath ("Sergeant Heath"). In addition to repeating what he had told Deputy Key, Defendant added that he left Victim's house around 4:30 p.m. that day to get gas and cigarettes, but returned sometime thereafter. He also stated that before he left he brought in Victim's mail and then got her a plastic cup filled with water and sat it on the TV tray next to her. Defendant said he was at Jerry Blagg's house when he learned that Victim had been assaulted.

During a break in the interview, Sergeants Heath and Cooper were told that someone had seen blood on Defendant's shoes. When the interview resumed, Sergeant Heath asked Defendant if he could see his shoes. Defendant obliged, and both officers saw what they believed to be blood droplets. Sergeants Heath and Cooper stopped the interview at that point and advised Defendant of his *Miranda*[3] rights. Defendant said that he understood his rights, and signed a written waiver at 2:57 a.m. Defendant stated that he did not have any idea where the blood had come from, and that Victim was alive when he last saw her. Defendant gave officers his consent to search his car and his clothes, which he said were in a bag at Jerry Blagg's house. When Defendant was told that he was not free to go, he asked for an attorney. At that point, Sergeant Heath terminated the interview and informed Deputy Walter Dearing ("Deputy Dearing"), Commander of the Dunklin County Major Case Squad, that Defendant had asked for an attorney. Deputy Dearing then entered the interrogation room where Defendant was sitting and told another officer that Defendant would be held in custody because his family members were making death threats towards him. Defendant responded, "I don't blame them."

Defendant returned to the Police Department on January 9, 2003, after agreeing to speak with Deputy Dearing, and signed a written waiver of his *Miranda* rights. Deputy Dearing began to interview Defendant and he again talked about his whereabouts on January 3, 2003, and said it was not possible that the blood on his shoes was Victim's blood. During the interview, the police received the preliminary results indicating that the blood splatter on Defendant's shoes was Victim's blood. Defendant said, "I couldn't do that," and again asserted his right to counsel. The interview ended, and Defendant asked Deputy Dearing if he was going to be arrested. Deputy Dearing told him yes, and Defendant then asked if he could have a cigarette and a cup of coffee. While Defendant was drinking the coffee he began to cry, and said, "I don't remember. I don't remember. . . . I been [sic] doing—drinking alcohol and doing marijuana and meth up until three days ago." Defendant then said, "I want the death penalty, I demand the death penalty."

Defendant's clothes and shoes were sent to the Missouri State Highway Patrol Crime Laboratory. The DNA on Defendant's t-shirt and shoe matched Victim's DNA. Defendant was charged with first degree murder, armed criminal action and first degree robbery. A jury trial was held from March 11–16, 2005. The jury acquitted Defendant of first degree murder, but found him guilty of second degree murder, armed criminal action and first degree robbery. The trial court followed the jury's recommendation and sentenced Defendant as indicated earlier. This appeal followed.

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## OPINION

Defendant raises seven points on appeal. In the first, he argues that the trial court erred in sustaining the State's objection to defense counsel's comment in closing argument that forensic examiner Brian Hoey ("Hoey") "contaminated" a known control sample with Victim's DNA, and in improperly commenting on the evidence to the jury, when stating, "[t]he jury will recollect the testimony of [ ] Hoey. The Court does not recollect his describing, in his words, 'contamination.'" Defendant alleges that the trial court's instruction invaded the province of the jury on the key element of the State's case. We disagree.

The challenged ruling and comment by the trial court are set out below:

[Defense Counsel]: No matter what you think of Amanda's testimony, you can't ignore the fact that there was some contamination of a control sample in the DNA analysis and that it was contaminated with DNA that had alleles that were similar to the alleles—that matched the alleles of [Victim].

[Hoey] messed up. He contaminated a known control sample with [Victim's] DNA—

[Prosecutor]: Your Honor, again, I'm going to have to object. There's no— absolutely no evidence whatsoever that there was any contamination by any sample to any other sample and that's just an absolute misstatement.

The Court: The jury will recollect the testimony of [ ] Hoey. The Court does not recollect his describing, in his words, "contamination." Please proceed.

Defense counsel then continued her closing argument as follows:

The reason we know this happened is because it was a known control sample. It's something that comes in the lab kits for the DNA lab and you run it and there's a paper in there that says when you—this known control, you will get the following results. And if you don't get the following results, there's a problem. And which there was a problem because there was another source of DNA in that known control sample and that DNA matched the DNA of [Victim]. And the only reason we knew about it and the only reason we found it is it happened in a known control sample.

. . . .

And another thing. He didn't report that there was a problem with that control sample. He didn't report that it was somehow mixed in with some other source of DNA. And when you mix two things together when you're not supposed to, there's no other word for it. It is contamination. And he didn't report it. . . .

"To ensure that a defendant receives a fair trial, a trial judge must maintain absolute impartiality during criminal proceedings." *State v. Garriott*, 151 S.W.3d 403, 411 (Mo.App. W.D.2004). "In the trial of any criminal case the court shall not, in the presence of the jury, sum up or comment on the evidence." Rule 27.06. *See also* Section 546.380. "A question or comment from a trial judge must not express his or her opinion of evidence in the case[.]" *State v. Bass*, 81 S.W.3d 595, 613 (Mo.App. W.D.2002). "This does not mean, however, that the judge may not correct counsel when necessary, as long as it is not done in a contemptuous manner[.]" *State v. Mitchell*, 693 S.W.2d 155, 160 (Mo.App. E.D.1985). Neither does it mean that a judge "may not summarize evidence in explanation of a ruling, as long as it is not a statement of the facts as a matter of law[.]" *Id.*

When determining the propriety of a trial court's comments on the evidence,

we consider whether (1) the comment was volunteered by the trial court, (2) was not made in response to an objection as part of the trial court's ruling, (3) was made in the presence of the jury (4) could have been construed by the jury to the prejudice of defendant, or (5) indicated to the jury that it was not to reach its own determination of the facts. *State v. Winrod,* 68 S.W.3d 580, 590–91 (Mo.App. S.D.2002).

Hoey's testimony relevant to this point is as follows:

[Hoey]: [I]t appeared as though the unknown DNA typed [sic] showed up in the positive control, which would indicate that the sample that the peaks— there were no peaks and ended up getting into the positive control and was not in the tube it was supposed to be in.

. . . .

As soon as I found out that there was a problem, I discarded that test and repeated my testing.

. . . .

[Prosecutor]: So there wasn't any transfer from that to any of the other tests that you ran that you did rely on?

[Hoey]: Not to my knowledge, no.

. . . .

[Defense Counsel]: . . . [T]hey tell you, this is what it is. If you run this positive control, you should only get this result.

[Hoey]: That's correct.

[Defense Counsel]: All right. And in fact, you got a mixed result?

[Hoey]: Yes, I did.

[Defense Counsel]: You got more DNA than was just in that positive control?

[Hoey]: Yes, I did.

[Defense Counsel]: It indicates contamination occurred; didn't it?

[Hoey]: Not necessarily, no.

. . . .

[Defense Counsel]: So it look [sic] like [Victim's] DNA somehow got contaminated with this positive control?

[Hoey]: The DNA that is consistent with the shoe, the shirt and [Victim].

The trial court's statement that it "does not recollect his describing, in his words, 'contamination[,]' " was a correct summarization of the evidence in explanation of its ruling. It was not volunteered, but was made in response to an objection. While the statement was made in the presence of the jury, it was short and neutral and could not be construed by the jury to the prejudice of Defendant. The trial court did not indicate to the jury that it was not to reach its own determination of the facts. Rather, the jury was instructed to "recollect the testimony of [ ] Hoey."

The record does not support Defendant's contentions that "the trial court specifically told the jury that the court did not recall testimony about contamination," or that "the trial court's comment on the key DNA evidence as not being contaminated left the jury with the impression that the DNA was reliable." The trial court merely stated that it "does not recollect his describing, in his words, 'contamination.' " The jury was free to believe, based on the evidence presented, that key DNA evidence was contaminated. In fact, defense counsel was permitted to make that very argument, without objection, to the jury:

He didn't report that there was a problem with that control sample. He didn't report that it was somehow mixed in with some other source of DNA. And when you mix two things together when you're not supposed to, there's no other word for it. It is contamination. And he didn't report it.

The jury was free to decide for itself whether the DNA evidence was contaminated. We do not read anything in the

record indicating a bias, prejudice or hostility towards Defendant that would prejudice the minds of the jury and deprive him of a fair trial. *See State v. Johnson*, 687 S.W.2d 706, 711 (Mo.App. W.D.1985). Point denied.

■ In his second point, Defendant argues that the trial court erred in denying his motion to suppress his statement, "I don't blame them." Defendant asserts that the statement was taken in violation of his Fifth Amendment privilege against self-incrimination, because it was given in response to custodial interrogation after he had invoked his right to counsel. We disagree.

■ "Where a motion to suppress was overruled and the evidence was introduced at trial, appellate review considers the evidence presented both at the suppression hearing and at trial in determining whether the motion should have been granted." *State v. Daggett*, 170 S.W.3d 35, 45 (Mo. App. S.D.2005)(quoting *State v. Reed*, 157 S.W.3d 353, 356 (Mo.App. W.D.2005)). Appellate review is limited to a determination of whether substantial evidence exists to support the trial court's ruling. *State v. West*, 58 S.W.3d 563, 567 (Mo.App. W.D. 2001). "We defer to the trial court's opportunity to determine the weight of the evidence and credibility of the witnesses when deciding whether sufficient evidence supports the trial court's determination." *Daggett*, 170 S.W.3d at 45.

■ "To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, . . . police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel." *Minnick v. Mississippi*, 498 U.S. 146, 147, 111 S.Ct. 486, 488, 112 L.Ed.2d 489, 494 (1990). The accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981). "[O]fficials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick*, 498 U.S. at 153, 111 S.Ct. 486.

In the present case, Defendant sought to suppress a statement made on January 4, 2003. On that date, after being advised of his *Miranda* rights, Defendant signed a written waiver and agreed to speak with Sergeant Heath. When Defendant was told that he was not free to leave, he invoked his right to counsel. Sergeant Heath ended the interview at that point. Deputy Dearing then entered the interrogation room where Defendant was sitting and told another officer that Defendant would be held in custody because his family members were making death threats towards him. Defendant responded, "I don't blame them."

■ Once an accused has asserted his constitutional right to speak with an attorney, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the [accused] knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602. "[H]owever, [not] all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307 (1980). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those

normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682.

We do not find that any interrogation occurred on January 4, 2003, after Defendant invoked his right to counsel. Deputy Dearing's statement to another officer that Defendant would be held in custody because he had received death threats was not "reasonably likely to elicit an incriminating response from [Defendant]." *Id.* "[T]he police surely cannot be held accountable for the unforeseeable results of their words or actions. . . ." *Id.* at 301–02, 100 S.Ct. 1682. We find no violation of Defendant's privilege against self-incrimination, as Defendant's statement was not the product of interrogation. The trial court did not err in denying Defendant's motion to suppress the statements he made to police on January 4, 2003. Point denied.

■ In his third point, Defendant argues that the trial court erred in denying his motion to suppress statements given on January 9, 2003, including a statement regarding his drug use, and his statement that, "I deserve the death penalty." Defendant maintains that those statements were taken in violation of his Fifth Amendment privilege against self-incrimination, because police reinitiated contact with Defendant after he had invoked his right to counsel on January 4, 2003. We disagree.

We reiterate that in assessing the propriety of the trial court's ruling on a motion to suppress, appellate review is limited to a determination of whether substantial evidence exists to support the trial court's ruling. *West*, 58 S.W.3d at 567. "We defer to the trial court's opportunity to determine the weight of the evidence and credibility of the witnesses when deciding whether sufficient evidence supports the trial court's determination." *Daggett*, 170 S.W.3d at 45.

After Defendant invoked his right to counsel on January 4, 2003, he was held for twenty hours then released. On January 8, 2003, Defendant's sisters went to the Police Department to discuss the investigation of Victim's murder. Deputy Dearing told the sisters that if he had talked to Defendant on January 4, 2003, he might have been able to get a confession or rule him out as a suspect, but now he could only talk to Defendant if Defendant wanted to talk to him. Amanda offered to call Defendant to try and get him to come and talk to Deputy Dearing.

Amanda called Defendant later that day and told him to talk to Deputy Dearing in order to prove his innocence. That evening, she called Deputy Dearing and asked him if he wanted to speak to Defendant. Deputy Dearing replied that while he would like to speak to Defendant, he could not do so, because Defendant had invoked his right to counsel. He made clear to Amanda that Defendant did not have to speak with him, but if he chose to do so, he must do so voluntarily.

When Deputy Dearing arrived at the Police Department the morning of January 9, 2003, he learned that Defendant had called and left his number, so he called Defendant and left him a message. A few minutes later, Defendant called back, saying that Amanda had told him that Deputy Dearing wanted to talk to him. Deputy Dearing responded that he was told by Amanda that Defendant wished to speak to him, and while he would have liked to talk to him the first night he was interviewed, he could not speak to him now unless Defendant wanted to. Defendant said he would speak to him, and they agreed to meet at the Police Department that afternoon.

Defendant arrived at the Police Department around 2:00 p.m., and again told Deputy Dearing that he wanted to speak with him. Deputy Dearing advised Defendant of his *Miranda* rights, and Defendant executed a written waiver of those rights. Some time after the interview had begun, Deputy Dearing was informed that the preliminary results of the blood splatters on Defendant's shoes showed that the splatter was Victim's blood. After being informed of the results, Defendant said, "I couldn't do that," and "I wouldn't let nobody else do that to my grandmother." He then asked if he was going to be arrested, and Deputy Dearing said yes.

Defendant once again asked for an attorney, and the interview ended. Upon request, Defendant was brought a cup of coffee. As he was drinking his coffee he became very emotional and he proceeded to make further statements. Deputy Dearing informed Defendant that he should not say anything because he had asked for an attorney, but Defendant spontaneously and repeatedly said, "I don't remember." He said that he had been "drinking alcohol and doing marijuana and meth up until three days ago." He then said, "I want the death penalty, I demand the death penalty."

In *Edwards*, 451 U.S. at 484, 101 S.Ct. 1880, the Supreme Court of the United States explained:

> [A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. (citations omitted).

Under the *Miranda–Edwards* rule, an accused who has requested to speak to an attorney "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880. This means that police may not reinitiate interrogation unless counsel is *present*. *Minnick*, 498 U.S. at 153, 111 S.Ct. 486.

In the present case, Defendant's statements on January 9, 2003, were properly admitted because: (1) Defendant was subjected to custodial interrogation only after he had reinitiated contact with law enforcement following a break in custody and then knowingly and voluntarily waived his right to counsel; and (2) the statements made after he had reasserted his right to counsel were volunteered statements made after interrogation had ceased.

"*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities[.]" *Id.* at 156, 111 S.Ct. 486. "[B]efore a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the 'suspect himself initiates dialogue with the authorities.'" *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405, 411–12 (1983)(quoting *Wyrick v. Fields*, 459 U.S. 42, 46, 103 S.Ct. 394, 395, 74 L.Ed.2d 214, 217 (1982)).

In the present case, Defendant himself initiated "further communication, exchanges, or conversations with the police," after he had first invoked his right to

counsel. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880. On appeal, Defendant argues that Deputy Dearing's "active role in recruiting [Defendant's] family members to persuade [Defendant] to reinitiate contact with him was an action that [Deputy] Dearing knew was likely to elicit an incriminating response from [Defendant]," and therefore, "[a]ny subsequent reinitiation of contact with the police and waiver of his right to counsel were not voluntary." However, in deciding whether sufficient evidence supports the trial court's determination regarding a motion to suppress, we defer to the trial court's opportunity to determine the credibility of the witnesses. *Daggett*, 170 S.W.3d at 45. Here, the trial court found that "[a]ll of the evidence at hearing [sic] indicated that Defendant initiated the subsequent contact and communication with Deputy Dearing on January 9." We find there was sufficient evidence supporting the trial court's finding. The record reveals that Defendant initiated contact with Deputy Dearing when he called and said he wished to speak with him. Deputy Dearing cautioned that he could only speak to Defendant if Defendant wanted to because Deputy Dearing was obligated to respect his invocation of his right to counsel. Of his own accord, Defendant later arrived at the Police Department. On these facts, we believe that there was not a violation of the *Miranda–Edwards* rule, and any statements taken before his reassertion of his right to counsel were properly admitted.

We also note that those statements taken before Defendant's reassertion of his right to counsel on January 9, 2003, followed a break in custody of several days. In *State v. Farris*, 125 S.W.3d 365, 371 (Mo.App. W.D.2004), the western district of this Court held "that a break of custody removes the concerns that underlie the prophylactic principles of *Miranda* and *Edwards*." The Court reasoned that "[w]hen the accused 'is released from police custody, he is no longer subject of the inherently compelling pressures of custodial interrogation and his Fifth Amendment rights which the *Miranda–Edwards* prophylactic rule was designed to protect are no longer in jeopardy.'" Id. at 371–72 (quoting *Commonwealth v. Wyatt*, 455 Pa.Super. 404, 688 A.2d 710, 713 (1997)). Finding the reasoning of *Farris* to be sound, we held in *State v. Bremenkamp*, 190 S.W.3d 487, 492–93, that the *Miranda–Edwards* rule does not extend beyond a "break in custody."

In keeping with this Court's prior holdings, when Defendant was again in custody on January 9, 2003, he was required to reassert his right to counsel, in order for the *Miranda–Edwards* rule to apply. Instead, Defendant waived his right to counsel and agreed to speak with police.

Defendant also alleges trial court error in the admission of statements made by him after he had reasserted his right to counsel. After Defendant requested to speak with an attorney on January 9, 2003, the interrogation ceased. Upon request, Defendant was brought a cup of coffee, and as he was drinking his coffee he proceeded to make further statements. Deputy Dearing informed Defendant that he should not say anything because he had asked for an attorney, but Defendant spontaneously and repeatedly said, "I don't remember." He said that he had been "drinking alcohol and doing marijuana and meth up until three days ago." He then said, "I want the death penalty, I demand the death penalty."

Once an accused has asserted his constitutional right to speak with an attorney, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the [ac-

cused] knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602. "[H]owever, [not] all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Innis*, 446 U.S. at 299, 100 S.Ct. 1682. When Defendant reasserted his right to counsel, the protection of the *Miranda–Edwards* rule was once again triggered and any subsequent statements resulting from custodial interrogation without counsel present would be inadmissible. However, the record clearly shows that the statements made by Defendant were volunteered and were not the product of custodial interrogation. Therefore, those statements were properly admitted.

The trial court did not abuse its discretion in denying Defendant's motion to suppress the statements he made to police on January 9, 2003, because Defendant reinitiated contact with police after a break in custody of several days before knowingly and voluntarily waiving his right to counsel, and those statements made by Defendant after he had reasserted his right to counsel were not the product of custodial interrogation. Point denied.

█ In his fourth point, Defendant argues that the trial court erred in precluding evidence that officers smelled ether near Victim's back door and near Mason's trailer because such evidence was relevant to challenge the credibility of the prosecution witness Rick.

█ "The trial court is vested with broad discretion in the admission or exclusion of evidence." *State v. DeClue*, 128 S.W.3d 864, 871 (Mo.App. S.D.2004). This discretion "includes the duty to determine the relevance and materiality of evidence proffered for impeachment." *State v. Wilson*, 105 S.W.3d 576, 585 (Mo.App. S.D.

2003). "We will not disturb a trial court's ruling in that regard absent a clear abuse of that discretion." *Id.* The trial court abuses its discretion where its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *State v. Smith*, 996 S.W.2d 518, 521 (Mo. App. W.D.1999). In addition, "[w]e review for prejudice and not mere error; thus, we will affirm the trial court's ruling unless it was so prejudicial as to deprive Defendant of a fair trial." *DeClue*, 128 S.W.3d at 871.

In the present case, the trial court refused to allow the defense to present evidence regarding the smell of ether in Victim's trash can and near Mason's trailer. In an offer of proof, Officer Hankins testified that on the night Victim was attacked he smelled ether coming from a trash can right outside Victim's back door. Officer Hankins explained that ether is associated with methamphetamine activity. He also noticed a similar smell coming from an area near Mason's trailer. However, he could not tell which trailer the smell was coming from. The court denied Defendant's offer of proof. Defense counsel renewed his objection to the exclusion of this evidence in his motion for new trial.

Defendant explains that "if Rick had been involved in methamphetamine activity at [Victim's] residence, he would have had a motive to fabricate a story about his activities or about [Defendant's] demeanor that evening." Thus, he argues that Rick may have had an interest in deflecting attention away from himself and onto Defendant. Defendant argues that "the exclusion of evidence bearing on Rick's credibility was extremely prejudicial to [Defendant's] right to present a defense and his right to a fair trial." We disagree.

 "[A]s a general proposition, the credibility of witnesses is always a relevant issue in a lawsuit." *Smith*, 996 S.W.2d at 521. "Anything that has the legitimate tendency of throwing light on the accuracy, truthfulness, and sincerity of a witness is proper for determining the credibility of the witness." *State v. Strughold*, 973 S.W.2d 876, 891 (Mo.App. E.D. 1998). "However, attacks on a witness' credibility in criminal proceedings are subject to limitations, and not every attack will be allowed." *Smith*, 996 S.W.2d at 521.

 "[T]he credibility of a witness cannot be attacked by showing a specific act of immorality or by showing that [his] general moral character is bad." *State v. Adams*, 51 S.W.3d 94, 101 (Mo.App. E.D. 2001) (citations omitted). "A witness' credibility may not be impeached with evidence of a mere arrest, investigation, or criminal charge, not resulting in a conviction." *State v. Wolfe*, 13 S.W.3d 248, 258 (Mo. banc 2000). "The impeaching testimony should be confined to the real and ultimate object of the inquiry, which is the reputation of the witness for truth and veracity. In other words, specific acts of misconduct, without proof of bias or relevance, are collateral, with no probative value." *Id.* (citations omitted).

 A specific act of misconduct has probative value where it is relevant to show a witness' bias. *Kuehne v. State*, 107 S.W.3d 285, 294 (Mo.App. W.D.2003). Proof of prior misconduct may be used to impeach a witness where inquiry shows (1) a specific interest; (2) a possible motivation to testify favorably for the State; or (3) an expectation of leniency. *Id.* The specific interest exception applies only where the impeachment evidence demonstrates a particular bias against the defendant. *Id.*

None of the bias exceptions apply to the present case. First, the proffered evidence does not demonstrate that Rick had a particular bias against Defendant. Second, the proffered evidence does not show that Rick had a possible motivation to testify favorably for the State. Third, there is no evidence that Rick was charged with any crime relating to the smell of ether, therefore, the proffered evidence fails to show that Rick had an expectation of leniency.

It is also noteworthy, that the proffered evidence fails to establish any connection between Rick and the ether smell. Officer Hankins testified that he believed he smelled ether coming from an area outside Victim's residence. However, he was not absolutely positive that he was smelling ether, and he did not look into the trash can to see what might be causing the smell. Officer Hankins also testified that he smelled ether in the area of Mason's trailer. While Rick had recently been at Mason's trailer, Officer Hankins testified that he could not tell which trailer the smell was coming from. No physical evidence was recovered that would indicate that ether was being used for methamphetamine manufacture.

 "[I]t is not error to exclude offers to impeach on immaterial or collateral matters." *Wolfe*, 13 S.W.3d at 258. The trial court did not abuse its discretion in precluding Defendant from presenting evidence regarding the smell of ether outside of Victim's residence and Mason's trailer. Defendant's fourth point is denied.

 In his fifth point, Defendant argues that the trial court erred in allowing the prosecution to conduct an experiment before the jury using a cup of ice, because the demonstration was unreliable and did not aid the jury in determining any fact at issue.

The following additional facts are relevant to this point on appeal. Hoey estimated that Victim's head injury was received anywhere between 5:00 and 7:00 p.m. on January 3, 2003. Defendant told officers he was present at Victim's residence from around 4:30 until 6:30 p.m. Officer Riley testified that when he arrived at Victim's residence shortly after 8:45 p.m., he noticed a full cup of ice sitting next to Victim on her TV tray. Defendant told Sergeant Cooper and Deputy Dearing that he got Victim a glass of water before he left. A photograph taken later showed a cup of water with no ice.

Defendant explains that "[i]f Officer Riley was correct, that there was a cup of ice sitting next to [Victim], then a reasonable inference is that someone was very recently present in her home close to the time that Rick discovered her at 8:30 p.m." In an attempt to cast doubt on Officer Riley's testimony, the prosecution conducted a demonstration with a glass full of ice in the courtroom. When defense counsel noted that the prosecutor had set a glass full of ice with no liquid in it on a table in the courtroom, he asked that it be removed. The prosecutor explained that he wanted to put the cup of ice into evidence as demonstrative evidence. He wished to show to the jury that a glass filled with ice will not generate the amount of water seen in the photograph of the glass on Victim's TV tray, so that the glass of ice Officer Riley saw must have contained both ice and water.

Defense counsel argued that the experiment was neither scientific nor reliable. Defense counsel complained that there was no way to know if the cup contained the same kind of ice cubes present at the scene; whether they were frozen to the same level as ice cubes from Victim's freezer; whether it was the same kind of cup; whether the temperatures were the same; or whether somebody had been holding the cup for any period of time. The prosecutor replied that none of the issues raised had any bearing on how much water would be left after the ice melted. The trial court ruled that the glass could remain, and that defense counsel could make arguments about any deficiencies in the demonstration.

Deputy Dearing testified that a glass full of ice had been sitting in the courtroom since 8:20 a.m. He explained that now over four hours and ten minutes later the ice was almost completely melted. Deputy Dearing did not know the size of the ice cubes Officer Riley observed at Victim's residence, and he did not know whether the conditions in the courtroom were the same as in Victim's residence.

■■■■ Demonstrative evidence is "evidence which is not the actual evidence connected with either the defendant or the crime charged." *State v. Rehberg*, 919 S.W.2d 543, 551 (Mo.App. W.D.1995). "Demonstrative evidence is admissible if it establishes a fact at issue, throws light on the issue, or aids the jury in any way in arriving at the correct verdict." *State v. Hahn*, 35 S.W.3d 393, 396 (Mo.App. E.D. 2000). "The precondition for admissibility, however, is that [such evidence] fairly represents the conditions which it is offered to show.'" *State v. Black*, 618 S.W.2d 466, 469 (Mo.App. W.D.1981). "The trial court is vested with broad discretion in admitting or rejecting demonstrative evidence, due to its superior vantage point for balancing the probative value of such evidence against its prejudicial effect." *State v. Candela*, 929 S.W.2d 852, 867 (Mo.App. E.D.1996).

■■■ Here, the prosecution did not prove that the demonstration at issue represented the conditions which it was offered to show; therefore, the demonstration procedure was erroneous. *See Black,*

618 S.W.2d at 469. However, this does not end our inquiry. "In matters involving the admission of evidence, this Court reviews for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Hayes*, 113 S.W.3d 222, 226 (Mo.App. E.D.2003). "A defendant must show there was a reasonable probability that without the admission of the evidence the verdict would have been different." *State v. Moore*, 88 S.W.3d 31, 36 (Mo.App. E.D.2002).

▉ We cannot say that Defendant was deprived of a fair trial by the admission of the questioned evidence. Nor can we say that without the admission of the evidence, the verdict would have been different. Officer Riley's testimony, if believed by the jury, does not negate the fact that Defendant, by his own admission, was alone with Victim during the time Hoey testified that the assault occurred. Furthermore, Defendant was given the opportunity to argue the deficiencies in the demonstration and prevent the jury from being misled. Deputy Dearing admitted under cross-examination that he had never seen the cup of ice at Victim's residence. He admitted that he did not know whether the ice used in the demonstration and the conditions in the courtroom were even remotely similar to the conditions at Victim's residence. Defense counsel further reminded the jury in closing argument that there was no evidence that the cup of ice in the courtroom was subjected to the same conditions and environmental factors as the ice in Victim's cup. We find no prejudice in the admission of the ice demonstration. Point denied.

▉ In his sixth point, Defendant argues that the trial court erred in permitting the prosecutor to use a button-down blue shirt as demonstrative evidence of what Defendant was wearing on the night of Victim's death. Specifically, Defendant argues that there was no showing that the shirt was similar in character to the shirt Defendant was allegedly wearing that night.

Defendant presented evidence at trial that the Victim's DNA found on his t-shirt could have been transferred when he hugged Amanda at the hospital. Amanda testified that when she saw Defendant at the hospital, he was wearing a dark colored button-up shirt with a white t-shirt underneath. She explained that she could see a white collar because the dark outer shirt was not buttoned up all the way. During his examination of Amanda, the prosecutor showed Amanda a blue-button up shirt. He told the jury that the shirt he held was not the shirt Defendant was wearing on January 3, 2003. The prosecutor asked Amanda if the shirt was similar to the one Defendant was wearing the night of the murder. Amanda responded that she was "not sure." Using the shirt as an example, Amanda demonstrated how far up Defendant's shirt was buttoned. In closing argument the prosecutor placed the blue shirt on a mannequin and argued:

> The shirt, [Amanda] told you, was buttoned up to the second button here. She said it—actually the shirt that he had on was buttoned up—the button was a little higher than this. Well, folks, (unbuttons shirt on mannequin) one of those bloodstains that was [Victim's] blood was down there under that closed-up shirt and under that coat.

Defense counsel objected to the introduction of the shirt into evidence, and to the prosecutor's use of the shirt on the mannequin in closing arguments. These objections were renewed in Defendant's motion for new trial.

Defendant argues that "the prosecutor here did not establish the conditions that would have made the demonstrative evi-

dence relevant and probative," because Amanda was unable to "testify that it was similar in nature to the shirt that she saw [Defendant] wearing." We disagree.

"Demonstrative evidence is admissible if it establishes a fact at issue, throws light on the issue, or aids the jury in any way in arriving at the correct verdict." *Hahn*, 35 S.W.3d at 396. "The precondition for admissibility, however, is that [such evidence] fairly represents the conditions which it is offered to show." *Black*, 618 S.W.2d at 469. "The trial court is vested with broad discretion in admitting or rejecting demonstrative evidence, due to its superior vantage point for balancing the probative value of such evidence against its prejudicial effect." *Candela*, 929 S.W.2d at 867.

The demonstrative evidence at issue here was a fair representation of the conditions it was offered to show. Amanda testified that Defendant was wearing a button-up shirt on the night of Victim's murder. The blue shirt used at trial assisted Amanda in demonstrating how far Defendant's shirt was buttoned up that night. The fact that Amanda was "not sure" that the blue shirt was similar to the shirt worn by Defendant did not affect the reliability of the demonstration. In addition, the demonstration aided the jury in determining whether Defendant could have gotten Victim's blood on his t-shirt when he hugged Amanda at the hospital. We cannot say the trial court abused its discretion in allowing the blue shirt to be used as demonstrative evidence. Point denied.

 In his seventh point, Defendant argues that the trial court erred in allowing Donna and Frankie to testify as to Frederick's statement that he "wasn't one to be messed with." Defendant asserts that this statement "is classic hearsay, and it was prejudicial." We disagree.

 "Hearsay statements are out-of-court statements used to prove the truth of the matter asserted, which, as a rule, are inadmissible." *State v. Lockett*, 165 S.W.3d 199, 204 (Mo.App. E.D.2005). "Generally, hearsay is objectionable because the one making the statement is not under oath or subject to cross-examination." *State v. Baker*, 23 S.W.3d 702, 715 (Mo.App. E.D.2000). "[T]he admission of hearsay evidence against a defendant violates his right to confront the witnesses against him." *State v. Debler*, 856 S.W.2d 641, 648 (Mo. banc 1993). However, "in order for an error in admission of hearsay to require reversal, Defendant must show that he suffered undue prejudice as a result of the error." *State v. Haddock*, 24 S.W.3d 192, 195 (Mo.App. W.D.2000). When hearsay evidence is merely cumulative of other evidence properly admitted at trial, such prejudice does not exist. *Id.* at 196.

Here, whether the statement in question is considered hearsay or not, its admission cannot be prejudicial, because it was cumulative of other non-hearsay evidence. Frederick's statement was offered as evidence of Defendant's motive to kill Victim. It was the State's theory that Defendant killed Victim because he needed money to pay a drug debt to Frederick. Defendant told Donna and Frankie that he owed Frederick money for methamphetamine and Frederick was looking for him. This evidence was admissible as admissions of Defendant. *See State v. Wallingford*, 43 S.W.3d 852, 855 (Mo.App. W.D.2001) (explaining that, "[i]n the case of an admission by a party opponent, the declarant is a party to the case, and an objection on the basis of hearsay cannot make sense because the party against whom it is offered does not need to cross-examine himself") (citations and quotations omitted). Thus even if Frederick's statement that "he wasn't one to be messed with" was errone-

ously admitted, it was merely cumulative of Defendant's statements made to Donna and Frankie. Point denied.

The judgment and sentence of the trial court is affirmed.

BATES, C.J., and BARNEY, J., concur.

PHILLIP R. GARRISON, Judge.

### ON MOTION FOR REHEARING OR MOTION TO TRANSFER

In his "Motion for Rehearing or Transfer to the Missouri Supreme Court," Defendant requests this Court to review the testimony of the State's DNA expert witness, Brian Hoey, as it relates to Defendant's first point on appeal, maintaining that "[t]his Court's selective recitation of the facts, and its omission of key facts that bear directly on the issue, distorts the record and does not provide [Defendant] a fair review of the trial court's ruling." Specifically, Defendant points to the omission of the following testimony in the Court's analysis:

> [Defense counsel]: Okay. And on April 21st, one of your bench notes said at that point, "positive control okay"?
>
> [Hoey]: Yes.
>
> [Defense counsel]: But you never put in your bench notes that there was a possibility of contamination in that 4/19 run?
>
> [Hoey]: I didn't realize it at that time.
>
> [Defense counsel]: Okay. You just recently discovered it when you were asked to go back and look at it?
>
> [Hoey]: That's correct.

Consideration of this testimony does not change the result reached in our opinion for two reasons: (1) Defendant references this testimony only in his reply brief; and (2) Defendant has not shown that he was prejudiced by the trial court's ruling.

 The testimony which Defendant complains was "inexplicably omit[ted]" from this Court's opinion is not quoted or cited to in Defendant's initial brief filed with this Court. In his brief, Defendant cites to various portions of the record in reference to Hoey's testimony, but not once does he quote the above testimony or provide this Court with a citation to the page of the transcript where the testimony is found. "All statements of fact and argument contained in any brief shall have specific page references to the legal file or the transcript." Rule 30.06(e); *see also* Rule 84.04(i). "[T]his requirement is mandatory and essential for the effective functioning of appellate courts, which cannot spend time searching the record to determine if factual assertions are supported by the record. This would effectively require the court to act as an advocate for the non-complying party[.]" *Brown v. Shannahan,* 141 S.W.3d 77, 80 (Mo.App. E.D.2004). It is not the duty of this court to search the transcript or record to discover the facts substantiating a point on appeal. *Block Financial Corp. v. America Online, Inc.,* 148 S.W.3d 878, 890 (Mo.App. W.D.2004).[1]

 In addition, Defendant's inclusion of the testimony in his reply brief does not cure the original omission. *Id.* The sole purpose of a reply brief is to rebut the arguments raised in the respondent's brief. *Estate of Dugger v. Dugger,* 110 S.W.3d 423, 427 n. 3 (Mo.App. S.D. 2003). A reply brief is not a place to raise

---

1. While this citation is to a civil case, its proposition holds for criminal cases, as the rules governing an appellant's brief are the same for civil and criminal cases. *See State v. Watkins,* 102 S.W.3d 570, 571 (Mo.App. S.D.2003)(explaining "[w]hether civil or criminal, all briefs filed in an appellate court must comply with Rule 84.04"); *see also* Rules 30.06 and 84.04.

new points on appeal because it deprives the respondent of his opportunity to answer an issue presented by an appellant. *Block Financial Corp.*, 148 S.W.3d at 890. Therefore, omission of the legal and evidentiary basis for an allegation of error "is not cured by the discussion in the reply brief." *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 389 (Mo.App. E.D. 2000).

 In this case, the State had no opportunity to respond to Defendant's reliance on the "omitted" testimony quoted in his reply brief. This is evidenced by the fact that the State does not address this testimony in its respondent's brief. When an appellant believes that a specific portion of the record is so tantamount as to affect the ultimate disposition upon appellate review, this portion of the record should be highlighted in the statement of facts and the argument portion of the appellant's brief.

Nevertheless, consideration of the "omitted" testimony does not change this Court's decision. As we stated in our opinion, the trial court's statement was short and neutral, and did not indicate to the jury that it was not to reach its own determination of the facts. In stating that the jury was free to believe, based on the evidence presented, that key DNA evidence was contaminated, we noted that defense counsel was allowed to make the following argument to the jury without objection:

He didn't report that there was a problem with that control sample. He didn't report that it was somehow mixed in with some other source of DNA. And when you mix two things together when you're not supposed to, there's no other word for it. It is contamination. And he didn't report it.

We also note that Defendant continues to misconstrue the trial court's statement. Defendant's allegation of error is premised on the following statement made by the trial court: "The jury will recollect the testimony of [ ] Hoey. The Court does not recollect his describing, in his words, 'contamination.'" In his brief, Defendant states that "the trial court specifically told the jury that the court did not recall testimony *about* contamination." (emphasis added). In his motion for rehearing, Defendant asserts that "the trial court's recollection that Hoey did not testify *about* contamination was clearly incorrect[.]" (emphasis added). A correct recitation of this statement is important to understanding the result reached in our opinion. Clearly, much of defense counsel's cross-examination of Hoey was devoted to a discussion *about* contamination. However, the trial court was correct in its recollection that Hoey never described in his words contamination. As we stated in our opinion, "[a] question or comment from a trial judge must not express his or her opinion of evidence in the case[.]" *State v. Bass*, 81 S.W.3d 595, 613 (Mo.App. W.D. 2002). This does not mean, however that the trial court "may not summarize evidence in explanation of a ruling, as long as it is not a statement of the facts as a matter of law[.]" *State v. Mitchell*, 693 S.W.2d 155, 160 (Mo.App. E.D.1985).

The trial court never stated that it did not recall testimony about contamination. This distinguishes the present case from that relied on by Defendant, *Rose v. Kansas City*, 125 Mo.App. 231, 102 S.W. 578, 580 (Mo.App.K.C.1907), in which the trial court stated incorrectly in response to an objection: "I don't think that was the testimony of Dr. Wilson." In finding error with the trial court's statement, the Court stated that "[t]he fact that defendant's counsel was stating the evidence of Dr. Wilson correctly, the action of the court practically deprived defendant of the bene-

fit of that evidence[.]" *Id.* The jury, in this case, was never given the impression that Hoey did not testify about contamination, and the possibility of contamination of the DNA evidence was reinforced by defense counsel's closing argument as previously discussed.

For the aforementioned reasons, consideration of the testimony which Defendant complains was omitted does not change the result reached in our opinion. Other issues raised in Defendant's motion require no further discussion. Defendant's motion is denied.

BATES, C.J., and BARNEY, J., concur.